In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3851

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ALFONSO RIVERA, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Western
Division.
No. 99 CR 50001--Philip G. Reinhard, Judge.

Argued February 28, 2001--Decided April 24,
2001

Before HARLINGTON WOOD, JR., KANNE, and
ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  The defendant,
Alfonso Rivera, Jr., entered a
conditional guilty plea to one count of
conspiring to possess with intent to
distribute in excess of 650 kilograms of
marijuana. In his plea agreement, he
reserved the right to appeal the district
court's denial of his motion to suppress
evidence seized from his residence by law
enforcement officers. At sentencing, the
court applied a two-level enhancement for
use of a minor to commit a crime, USSG
sec. 3B1.4, and ultimately sentenced him
to 188 months imprisonment. He now
appeals the court's denial of his motion
to suppress and its application of sec.
3B1.4.

The facts surrounding the seizure of the
evidence on Dec. 28, 1998, at Rivera's
residence are dispositive of the fourth
amendment challenge, so we will recount
them in some detail. On December 4, 1998,
the Rockford office of the Drug
Enforcement Administration (DEA) and the
Rockford Police/Winnebago County Sheriff
Metro Narcotics Unit ("Metro") received

information from DEA agents in Washington D.C. concerning shipments of marijuana being transported to Rockford. The D.C. agents informed the Rockford agents that they were conducting an investigation involving a factory, Asesoria Especializada, in Laredo, Texas, that was using trucking and freight companies to ship marijuana within the United States. Those shipments were labeled as candles. The D.C. agents indicated that such a shipment had just been sent via Roadway Express Trucking Company to Rockford, and that a previous shipment had been sent in October in the same manner.

In response to that report, a DEA agent and a Metro detective went to the Roadway facility in Rockford that same day and were informed that a shipment from Laredo was picked up by four males two days earlier. The shipping invoices listed a shipment of 2,340 pounds of candles from the factory, bound for Angel's Gift Shop in Rockford, which was paid for with three traveler's checks. A review of the shipping invoice for October revealed a shipment of 890 pounds of candles to the same destination. The Roadway employee agreed to contact them if any similar shipments arrived.

On December 28, 1998, the Roadway facility contacted the DEA in Rockford and advised them that another shipment had arrived and was scheduled for pickup later that day. The shipment had the same source and destination, and consisted of 5 skids of boxes purportedly containing 3,900 pounds of candles. A police dog conducted a sniff search and alerted to the presence of controlled substances at the boxes. The agents then set up surveillance to await the pickup.

At 3:00 that afternoon, a brown van marked "Miriam's Cleaning Service" and towing a trailer arrived at the Roadway facility, and two males loaded the shipment into it. At that time, officers also observed two males in a red Cadillac near the facility, who appeared to be conducting counter-surveillance while the shipment was loaded. When the van exited the Roadway facility, the Cadillac followed, and at one point, the two cars stopped and one of the men relocated from the van to the Cadillac. At approximately 3:49, the van and trailer parked at Rivera's residence, and he and others,

including his minor son, unloaded the boxes into the house.

While agents and officers continued their surveillance of the residence, a detective began preparing an affidavit and application for a search warrant based on the information obtained thus far. Soon thereafter, beginning around 4:00, vehicles began arriving at the residence with frequent regularity. Between 4:02 and 4:32, vehicles arrived at the residence every 1-6 minutes, a total of ten times involving nine different vehicles within that half-hour time period. In nearly every case, the driver of the vehicle entered the home and 3-4 minutes later exited carrying a package and drove away. The law enforcement officers lacked the resources to stop these vehicles after they left, but maintained surveillance of the residence. One of the cars that arrived during that time was a maroon Toyota. The occupants left with a package at 4:22, but the vehicle returned to the residence at 4:32. None of the other cars had returned to the residence after leaving. One of the officers conducting surveillance from a vehicle a few blocks away reported by police radio that the maroon Toyota sighted by others at the residence drove by his location and then performed a U-turn in front of his vehicle and drove past him again.

At approximately 4:20 or 4:30, Captain McMahon, who was conducting surveillance and monitoring the radio communications, contacted a Winnebago County Assistant State's Attorney and advised him of the problems they were facing. McMahon believed that the activity at the residence indicated that the drugs were being picked up by various individuals. He further was concerned because it was getting dark, and traffic was increasing as people were leaving work. Finally, he feared that if the drivers of the vehicles became aware of the surveillance, they would call back to the residence and alert those inside. The district court noted that the actions of the maroon Toyota in circling back past the officer and in returning to the residence provided some support for alarm that the surveillance may have been spotted. The ASA advised Captain McMahon to proceed to secure the residence.

The officers then approached the residence, knocking and announcing their presence. Several individuals fled from the residence but were apprehended. The officers forcibly entered the residence, conducted a sweep search for security purposes, and detained the occupants in the living room until the warrant was issued. The security sweep lasted for only 45-60 seconds, and no information obtained in the sweep was used to secure the search warrant. Once the warrant was issued at approximately 6:15, the officers conducted a search of the premises and seized the evidence at issue here, including: open and intact bales of marijuana, scales, cutting instruments, drug ledgers, a garbage bag containing $124,000 in cash, an SKS assault rifle, and boxes containing candles and marijuana. The total amount of marijuana involved was approximately 1400 pounds.

I.

The district court ruled that the evidence was admissible, holding that the initial warrantless entry into the house was justified by exigent circumstances, and that even if it had not been, the evidence was admissible under the independent source doctrine because the warrant was obtained independent of the initial entry. We need not reach the issue of whether the evidence was admissible under the independent source doctrine, because we agree that the fourth amendment was not violated by the officers' initial entry into the residence.

The "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed,'" and accordingly, warrantless entries are considered presumptively unreasonable. Payton v. New York, 445 U.S. 573, 585-86 (1980), quoting United States v. United States District Court, 407 U.S. 297, 313 (1972); United States v. Saadeh, 61 F.3d 510, 516 (7th Cir. 1995). Such searches are constitutionally permissible, however, where there is probable cause and exigent circumstances create a compelling need for official action and insufficient time to secure a warrant. United States v. Marshall, 157 F.3d 477, 481-82 (7th Cir. 1998). The government has the burden of proving that its officers had an objectively reasonable

basis for believing such exigent circumstances existed at the time of the warrantless entry. Id. at 482. Exigent circumstances have been found where officers had an objectively reasonable fear that evidence was about to be destroyed or removed. Id.; Mincey v. Arizona, 437 U.S. 385, 394 (1978). The relevant focus is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed or removed before a warrant could be secured. Marshall, 157 F.3d at 482.

Rivera does not dispute that the officers possessed probable cause in this case, and argues only that there were no exigent circumstances. He asserts that the officers believed this to be a very large shipment of marijuana based on the weight of the shipment, 3300 pounds, and the information that the shipment contained marijuana rather than another drug. The packages being removed from the residence, however, could not have contained more than three or four pounds each. Therefore, Rivera argues that only a small portion of the evidence was being removed and that does not constitute exigent circumstances. As support for this argument, Rivera points to the failure of the officers to stop the vehicles that were leaving the residence, which he argues would have been done if they believed a substantial portion of the evidence was being lost.

Essentially, Rivera asks us to adopt a rule that exigent circumstances do not exist until a substantial portion of the evidence is in danger of being removed or destroyed. We decline that invitation. First, it is a completely unworkable standard. In determining whether exigent circumstances exist, we analyze the situation from the perspective of the officers at the scene, id., and it is virtually impossible for officers to make the type of proportionality analysis recommended by Rivera. Officers should not have to engage in a guessing game as to how much evidence has been removed and how much remains, before they can bring the depletion to a halt. Moreover, even the destruction or removal of a relatively small amount of evidence can have significant consequences at sentencing, where the drug quantity

impacts the sentence. The exigent circumstances exception to the warrant requirement prevents officers from invading the privacy of the home except in unusual circumstances, and we are disinclined to handcuff the ability of officers to prevent the imminent loss of evidence in a circumstance such as this one, where probable cause is unquestioned and the warrant is being sought in a timely and good-faith manner.

We are not here presented with the situation in which a de minimis amount of evidence is being removed, and the officers immediately enter the premises based on that flimsy justification. The officers here were presented with a veritable parade of cars, each departing with what the officers presumed to be the illegal narcotics. There is no question that the officers were legitimately faced with the removal of contraband from the residence while awaiting the warrant. If we were to define exigent circumstances as requiring that a certain quantum of evidence is in danger of destruction or removal--a magic number that must be reached before they can end the depletion--we would be imposing an unworkable standard on law enforcement officers who must make quick decisions at the site. That is not required by the Fourth Amendment, which by prohibiting only "unreasonable" searches and seizures necessarily recognizes that a balance must be maintained between the needs of law enforcement and the right to privacy. Rivera's interpretation of exigent circumstances would severely undermine the ability of law enforcement officers to prevent the imminent destruction or removal of evidence, and would upset that balance. Accordingly, the district court properly granted the motion to suppress.

II.

Rivera also questions the district court's imposition of a two-level enhancement under sec. 3B1.4 for his use of a minor in the offense. The basis for that enhancement was the use of Rivera's son, Alfonso Rivera III, in unloading the marijuana from the van, weighing quantities of marijuana in the residence, and retrieving money to pay the co-conspirators. Pursuant to sec. 3B1.4, a two-level enhancement is appropriate if "the defendant used or attempted to use a

person less than eighteen years of age to commit the offense." U.S.S.G. sec. 3B1.4. Application Note 1 to that section explains that "used or attempted to use" includes "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." In United States v. Ramsey, 237 F.3d 853, 859 (7th Cir. 2001), we noted that in accordance with the definition found in the Application Note, the language of sec. 3B1.4 should be construed fairly broadly. We further held that, in considering an enhancement under sec. 3B1.4, the relevant inquiry is whether the defendant took affirmative acts to involve the minor in the commission of the offense. Id. at 860.

The facts in this case, as properly found by the district court, support imposition of the enhancement under that standard. Rivera concedes that his son participated in unloading the marijuana from the van to the residence. In addition, two participants in the conspiracy testified that the son engaged in other actions related to the offense at Rivera's direction. Sergio Galvan testified that Rivera sent his son upstairs to retrieve $2000 from a garbage bag in the bedroom, which he used to pay a co-conspirator for the work. Galvan further testified that Rivera asked him to weigh marijuana, and that while he was doing so Rivera's son joined him and helped in the weighing and packaging. The other testimony came from Francisco Uresti, who asserted that he heard Rivera ask his son to help them move the boxes containing marijuana.

Rivera's sole contention on appeal is that he took no affirmative act to involve his son in the commission of the offense. Essentially, Rivera argues that any actions by his son, such as unloading the marijuana from the van, were done on his son's own initiative, and were not done at his "direction" or with his "encouragement." That assertion is belied by the testimony of Galvan and Uresti, which the district court credited. Rivera argues that the court should not have credited their testimony, because it was obtained pursuant to incentives in their plea agreement, and because it contained inconsistencies. The district court, however, recognized the shortcomings in their testimony, but also noted that their claims were bolstered in part by

the son's actions in helping to unload the van in his father's presence. The court noted that if Rivera did not want his son aiding in the offense, he could have told him to stop. His failure to do so thus provided some corroboration for the witness' testimony that he sought his son's help. Rivera has failed to demonstrate that the court's credibility determination was erroneous. That testimony is sufficient to support the sec. 3B1.4 enhancement.

For the above reasons, the decision of the district court is

AFFIRMED.